**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JERRY SAYABATH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CONDUENT INCORPORATED, CONDUENT BUSINESS SERVICES, LLC, and HEALTH CARE SERVICE CORPORATION<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## CLASS ACTON COMPLAINT

Plaintiff Jerry Sayabath ("Plaintiff"), by and through his undersigned counsel, bring this Class Action Complaint on behalf of himself and all others similarly situated (the "Class") against Defendants Conduent Business Services, LLC, a wholly-owned subsidiary of Conduent Incorporated, ("Conduent"), and Blue Cross Blue Shield of Illinois, a division of Health Care Service Corporation ("Blue Shield") (collectively, "Defendants"). Except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge, the following allegations are made upon information and belief, including investigation conducted by counsel.

## NATURE OF THE ACTION

1. This action arises from a significant hub-and-spoke data breach that exposed the personally identifiable information ("PII") and protected health information ("PHI") of at least 10,515,849 individuals (collectively, "Private Information"). The breach resulted from Defendants' failure to implement adequate data security measures and provide timely notification to affected individuals.

2. Conduent is a technology company based in New Jersey that provides back-office services to government agencies and healthcare organizations.

3. Blue Shield is a health plan based in Illinois that insures over 8.9 million members.[1]

4. To provide its services, Conduent collects, processes, and stores Plaintiff's and Class Members' Private Information. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Conduent assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. By voluntarily undertaking the collection of this sensitive Private Information, Conduent assumed a duty to use due care to protect that information.

5. Despite its duties to Plaintiff and Class Members, upon information and belief Conduent stored their Private Information on a database that was negligently and/or recklessly configured. This misconfiguration allowed files on the database to be accessed without a password or any form of multifactor authentication.

6. Between October 21, 2024, and January 13, 2025, a ransomware group known as Safepay infiltrated Conduent's network, and accessed and exfiltrated confidential files (the "Data Breach"). The compromised information includes names, Social Security numbers, medical information, and health insurance information. Conduent reportedly detected the breach on January 13, 2025. On or about April 9, 2025, three months after discovering the Data Breach, Conduent reported the incident via a Form 8-k Filing with the United States Securities and Exchange Commission ("Form 8-K Notice").

7. In a publicly available post to its leaksite, Safepay claimed to have stolen 8.5TB of

[1] https://www.bcbsil.com/

zipped data from Conduent.[2]




8. Conduent's Form 8-K Notice and Data Breach Notice obfuscated the nature of the breach and the threat it posed—refusing to tell its customers how many people were impacted and how the breach happened.

9. Conduent's failure to timely report the Data Breach compounded the harm of the Data Breach by leaving victims vulnerable and completely unprotected from identity theft. Victims were not warned to monitor their financial accounts, credit reports, insurance or medical records to prevent unauthorized use of their Private Information.

10. Conduent did not begin providing substantive notice to the victims and regulators until October 24, 2025—more than 10 months after detection, and more than an entire year after the Data Breach.[3]

---

[2] https://www.comparitech.com/news/another-ransomware-gang-says-it-breached-it-giant-conduent/

[3] On or about April 9, 2025, three months after discovering the Data Breach, Conduent reported the incident via a Form 8-k Filing with the United States Securities and Exchange Commission ("Form 8-K Notice").

11. The exact nature and extent of the Data Breach is unknown, and such information is within the exclusive possession and control of Conduent.

12. According to at least one of Conduent's reports to state attorneys general, there are 10,515,849 victims.

13. As a result of Conduent's failure to protect the sensitive information it was entrusted to safeguard, Plaintiff and Class Members have already suffered harm and have been exposed to a significant and continuing risk of identity theft, financial fraud, and other identity-related fraud for years to come.

## PARTIES

14. Plaintiff Jerry Sayabath is an adult, who at all relevant times, is and was a citizen of the State of Iowa. Plaintiff Sayabath is a client of one of Conduent's customers.

15. Defendant Conduent Incorporated is a New York company with its principal place of business at 100 Campus Drive, Suite 200, Florham Park, New Jersey 07932.

16. Defendant Conduent Business Services LLC is a Delaware limited liability company with its principal place of business at 100 Campus Drive, Suite 200, Florham Park, New Jersey 07932.

17. Defendant Health Care Service Corporation, operating through its division Blue Cross Blue Shield of Illinois. Health Care Service Corporation is a Texas corporation with its principal place of business at 300 E. Randolph St. FL 4, Chicago, IL 60601

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because Plaintiff and at least one member of the proposed Class are citizens of a state different from at least one

Defendant,[4] the proposed Class consists of more than 100 members, and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

19. This Court has general personal jurisdiction over Blue Shield, as, at all relevant times, Blue Shield was headquartered in Illinois, has engaged in substantial business activities in Illinois, regularly conducts business in Illinois, and has sufficient minimum contacts in Illinois.

20. This Court has specific personal jurisdiction over Conduent because it contracted with Illinois-based Blue Shield to process sensitive data. Plaintiff's claims arise directly from that relationship and the Data Breach, which involved data handling originating in Illinois. Conduent purposefully availed itself of the privilege of conducting business in Illinois by seeking and engaging with an Illinois-based client.

21. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District. Defendants conduct substantial business in this District, and the Data Breach has caused harm to Plaintiff and Class Members residing in this District.

## FACTUAL BACKGROUND

### A. Defendants Collected, Stored, and Failed to Safeguard Plaintiff's and Class Members' PII.

22. Conduent advertises that it provides "Innovative solutions and services for business and government."[5] According to its website "Nearly half of Fortune 100 companies and more than 600 government and transportation agencies depend on us each day as their trusted partner to

---

[4] *See* 28 U.S.C. § 1332(d)(10) (stating that for purposes of CAFA jurisdiction, an unincorporated association is deemed to be citizen of State where it has its principal place of business and under whose laws it is organized).

[5] https://www.conduent.com/

manage their business processes and end-user interactions."[6]

23. In its ordinary course of business, Conduent obtains, stores, maintains, and uses Plaintiff's and Class Members' Private Information.

24. Blue Shield is a national health insurance carrier. It provides coverage to over 8.9 million individuals and "[f]or more than 85 years, we've provided our members with comprehensive, affordable health plans, making Illinois a healthier place to live, work and play. "[7]

25. Defendants agreed to and undertook legal duties to maintain the Private Information of Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws and regulations.

26. In the course of providing health insurance services, Blue Shield and other clients of Conduent collect and maintain large volumes of sensitive personal and medical information from their members, including names, dates of birth, Social Security numbers, insurance identification numbers, claims data and information, and other personally identifiable and protected health information.

27. Plaintiffs and Class Members entrusted Blue Shield and other clients of Conduent with their PII and PHI in order to receive health insurance services and reasonably expected that it would be kept secure and confidential.

28. Blue Shield explicitly acknowledges its duty to protect the privacy of members' health information. In its *Privacy Statement* Blue Shield says, "We know how important the

---

[6] https://www.conduent.com/about-conduent/?_gl=1*cypztj*_up*MQ..*_ga*MTUyMjIyMTY2Ni4xNzYxNzY1OTY0*_ga_21KBGVSV08*czE3NjE3NjU5NjQkbzEkZzEkdDE3NjE3NjU5ODMkajQxJGwwJGgw
[7] https://www.bcbsil.com/

security and privacy of data is to you."[8]

29. Blue Shield also posts on its website a *HIPAA Notice of Privacy Practices*,[9] which includes the same or similar representations, and additional representations such as:

a. "Blue Cross and Blue Shield of Illinois (BCBSIL) is committed to protecting your privacy and understands the importance of safeguarding medical information."

b. "We may disclose PHI to a Business Associate which is an entity or person that performs activities or services on our behalf that involve the use, disclosure, access, creation, or storage of PHI. We require a Business Associate to execute appropriate agreements before they initiate these activities or services."

c. "We also have the following responsibilities and legal obligations to:

i. Maintain the privacy and security of your PHI.

ii. Notify you in the event you are affected by a breach of unsecured PHI. …

iii. Refrain from using or disclosing PHI in any manner not described in this notice unless you authorize us to do so in writing."[10]

30. Blue Shield's *Code of Conduct* applies to employees, business partners, and anyone working on its behalf.[11] It states: "We respect and protect the privacy and security of the information we maintain about our members, customers, business partners, and workers. … We

[8] https://www.bcbsil.com/legal-and-privacy/terms-of-use-and-privacy-statement

[9] https://www.bcbsil.com/il/documents/privacy/il-privacy-practices-notice.pdf

[10] https://www.bcbsil.com/il/documents/privacy/il-privacy-practices-notice.pdf

[11] https://www.bcbsil.com/il/documents/compliance/code-conduct-il.pdf

maintain significant amounts of Business Confidential Information (BCI), which is a valuable competitive asset of the Company and/or Personally Identifiable Information (PII) of our members, customers, providers, or workers. In the wrong hands, this information could be used to commit fraud, steal personal identities, or compromise our business."[12] "PII should only be shared with or accessed by authorized parties both inside and outside of the Company and in compliance with applicable federal and state laws, as well as Corporate and departmental policies and procedures."

31. Blue Shield's *Code* further states "Why we protect and safeguard PII: The improper use or disclosure of PII can: 1) Damage an individual's reputation, cause embarrassment, or result in identity theft. 2) Violate federal or state privacy and security laws which could lead to lawsuits or serious penalties for individual workers or the Company."[13]

32. Blue Shield also maintains a *Code of Conduct for Vendors*, which imposes clear and specific obligations on its vendors regarding the handling of sensitive information. It requires vendors to "protect the privacy and confidentiality of information entrusted to us."[14]

33. The *Code of Conduct for Vendors* further states: "Our Company takes its obligation to protect the Personally Identifiable Information (PII) which includes Protected Health Information (PHI), State Personal Information, and Contract Personal Information (CPI) of members, employees, contingent workers, Vendors and customers, including any of our Company's Business Confidential Information (BCI) that we may create, collect or maintain very seriously. If a Vendor accesses, uses, creates or stores any of our Company's PII or BCI, the Vendor may be required to sign the Company Business Associate Agreement ("BAA") and/or the Company Minimum Security Requirements ("MSR") Addendum."

---

[12] https://www.bcbsil.com/il/documents/compliance/code-conduct-il.pdf

[13] https://www.bcbsil.com/il/documents/compliance/code-conduct-il.pdf

[14] https://www.bcbsil.com/il/documents/compliance/code-conduct-vendor-il.pdf

34. Blue Shield's *Code of Conduct for Vendors* requires vendors "to manage risk and implement reasonable and appropriate security measures. Vendors must comply with applicable laws and contractual requirements regarding PII and BCI. To the extent a Vendor has access to our Company systems or confidential information, including PII and BCI, and a security incident does occur, the Vendor will report the incident as soon as possible, within 24 hours, and in any event no later than as required pursuant to the terms of its agreements with our Company. … Vendors who access and use our Company's information must limit access to the Vendor's personnel that are directly assigned to work on our Company-sanctioned projects. Any sharing of our Company information among Vendor's [sic.] must be limited to the minimum necessary and can only be shared via our Company approved network environment. Vendors may not use our Company information in any way not approved or authorized by our Company."[15]

35. Blue Shield maintains a "Cybersecurity" page on their website that states "Keeping your health data and personal information safe is our goal. Your trust is earned through our actions. All technology cybersecurity measures we implement are designed with one goal. We strive to keep your health information safe so you can focus on what matters—your health and wellbeing."[16]

36. On its cybersecurity page Blue Shield acknowledges its place as a target: "The information you have on file with Blue Cross and Blue Shield of Illinois includes a lot of private details. That means BCBSIL and other health insurers like us can be the target of hackers. Protecting your private health information is **our responsibility**. It is **core to our mission of doing everything we can** to stand by our members." (emphasis added)

---

[15] https://www.bcbsil.com/il/documents/compliance/code-conduct-vendor-il.pdf
[16] https://www.bcbsil.com/about-us/cybersecurity

37. Blue Shield details how it protects Plaintiff's and Class Members' data "Our cybersecurity experts protect our members' data from hacking threats. They also manage and monitor our cybersecurity tools." Notably this discussion does not mention steps Blue Shield takes to vet its vendors.

38. Plaintiff alleges that Conduent accessed, used, and maintained PHI and PII on behalf of Blue Shield and was therefore a Business Associate subject to the obligations imposed by HIPAA and Blue Shield's internal policies. As such, Conduent was required to comply with HIPAA, enter into a Business Associate Agreement and Security Addendum, and implement appropriate privacy and security safeguards consistent with Blue Shield's *Code of Conduct for Vendors*.

39. Despite these obligations, Blue Shield failed to adequately vet or oversee Conduent's data security practices, in violation of its own policies requiring vendors to comply with HIPAA and maintain robust privacy protections. Blue Shield also failed to verify whether Conduent had implemented the required privacy training, risk management systems, and contractual safeguards outlined in its *Code of Conduct for Vendors*.

40. Blue Shield's failure to ensure that its vendor adhered to basic privacy and security practices—despite its public commitments and legal obligations—constitutes a breach of its own policies and directly contributed to the exposure of Plaintiffs' and Class Members' sensitive information.

41. Conduent, for its part, failed to comply with the privacy, security, and operational requirements imposed by HIPAA, industry standards, its contractual obligations as a Business Associate, and the standards set forth in Blue Shield's *Code of Conduct for Vendors*.

42. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class

Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that it was responsible to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

43. Plaintiff and Class Members relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this Private Information.

44. Conduent touts its data security to potential customers "Unlock your operational agility. Legacy systems, regulations, manual processes and data security all make it difficult for small to mid-sized health plans to compete. Our comprehensive suite of solutions empower health plans to manage daily operations at scale."[17]

45. In its Privacy Policy Conduent explicitly acknowledges and promises:

a. "We respect and are committed to safeguarding the confidentiality, data privacy, and security that our customers have entrusted to us, including the confidential information, personally identifiable information, proprietary information, and trade secrets gathered across all of our business operations. Conduent's commitment to data privacy goes beyond the minimum legal and regulatory requirements and strives for best-in-class data protection and privacy management."

b. "This privacy notice applies to the personal data collection, use, and disclosure practices of Conduent and its affiliated entities … it also applies to the collection, use and disclosure of information we collect from vendors, clients, individuals and entities who contact us."

[17] https://www.conduent.com/healthcare-business-solutions/health-plan-administration/?_gl=1*1qd8ghq*_up*MQ..*_ga*MTEzNzQxMzcyOC4xNzYxNzY4MDg0*_ga_21KBGVSV08*czE3NjE3NjgwODMkbzEkZzEkdDE3NjE3NjgxNzkkajYwJGwwJGgw

c. "When we have no ongoing legitimate business need to process your personal information, we will either delete or anonymise it or, if this is not possible … then we will securely store your personal information and isolate it from any further processing until deletion is possible."

d. "Conduent uses technical, organizational, and physical measures designed to protect the integrity, confidentiality, security, and availability of personal information. Among other measures, only authorized personnel of Conduent and of our third-party service providers with a legitimate need to know are provided access to personal data, and these employees and third-party service providers are required to treat this information as confidential where applicable."

e. "Data Security Risk Approach:

i. Conduent's security program is aligned with applicable industry regulatory requirements, including but not limited to NIST, HITRUST, GDPR, HIPAA, ISO, and PCI. The program encompasses information security and cyber operations capabilities that protect Conduent and our clients. It is continuously reviewed and strengthened as necessary to ensure responsiveness to and protection against emerging threats. Conduent maintains a highly qualified workforce and utilizes external experts to support the program. We administer internal education, training, and communication programs to ensure ongoing awareness and vigilance. We maintain and communicate formal documented policies and standards. We monitor and assess the overall operating effectiveness of our program through risk assessments that include identification and remediation of

> vulnerabilities and threats. We maintain and test our cyber incident response plan, and undertake various independent reviews in conjunction with PCI DSS, external audits, internal audits, and client assurance efforts. Various additional operational protections, controls, and processes exist, including but not limited to malware protection, intrusion prevention, and detection protocols, user access reviews, network segmentation, implementation and maintenance of network and application firewalls, vulnerability scanning, data encryption, penetration testing, and patching."

22. Plaintiff and Class Members directly or indirectly entrusted Defendants with sensitive and confidential information, including their Private Information which includes information that is static, meaning it does not change, and can be used to commit myriad financial crimes.

23. Conduent's *Code of Conduct* applies to all "employees and those who do business on Conduent's behalf, including agents, representatives and independent contractors." It states: "We respect and are committed to safeguarding the confidentiality, data privacy and security of information that our customers have entrusted to us, including confidential information, personally identifiable information, proprietary information and trade secrets. We exercise appropriate care at all times to prevent unauthorized disclosure and use of customer information. We take our responsibilities for customer confidentiality, data privacy and security seriously and implement appropriate safeguards for the use and handling of this information in accordance with our information security and privacy policies and in accordance with all applicable laws."[18]

---

[18]https://downloads.conduent.com/content/usa/en/document/Code-of-Conduct_032825_English.pdf?_gl=1*uw4uuu*_up*MQ..*_ga*MTEzNzQxMzcyOC4xNzYxNz

24. Conduent did not implement reasonable and appropriate administrative, technical, and physical safeguards to protect the sensitive data it received and maintained.

25. As a result of Defendants' failure to comply with their privacy and security obligations, Plaintiff's and Class Members' sensitive Private Information was accessed and stolen by cybercriminals.

**B. The Data Breach.**

26. On January 13, 2025, Conduent discovered that an unauthorized party gained access to Conduent's systems on October 21, 2024. The specific details regarding the extent of the Data Breach are Conduent the exclusive control of Conduent.

27. Conduent began providing individual notice to victims in October 2025, stating:

> **What Happened?** On January 13, 2025, we discovered that we were the victim of a cyber incident that impacted a limited portion of our network. We immediately secured our networks and initiated an investigation with the assistance of third party forensic experts. Our investigation determined that an unauthorized third party had access to our environment from October 21, 2024, to January 13, 2025, and obtained some files associated with <>. Given the nature and complexity of the data involved, Conduent has been working diligently with a dedicated review team, including internal and external experts, to conduct a detailed analysis of the affected files to identify the personal information contained therein. We are providing you with this notice upon the recent conclusion of this time-intensive data analysis as your personal information was contained in the affected files obtained by the threat actor.
> **What We Are Doing?** Upon discovery of the incident, we safely restored our systems and operations and notified law enforcement. We are also notifying you in case you decide to take further steps to protect your information should you feel it appropriate to do so.

28. Because Conduent failed to properly protect and safeguard Plaintiff's and Class Members' Private Information, an unauthorized third party was able to access Conduent's database and exfiltrate Private Information.

---

Y4MDg0*_ga_21KBGVSV08*czE3NjE3OTE1ODckbzIkZzEkdDE3NjE3OTE1OTIkajU1JGw wJGgw

### C. The Data Breach was Foreseeable and Preventable.

29. Organizations operating in the healthcare, health-related, financial, and government sectors have long been recognized as high-value targets for cybercriminals. These entities collect and store vast amounts of sensitive information—including patients' financial data, login credentials, insurance details, medical records, diagnoses, and employees' personal information—all of which command high prices on underground markets.

30. In response to growing cybersecurity threats, the Federal Bureau of Investigation ("FBI"), the Cybersecurity and Infrastructure Security Agency ("CISA"), and the U.S. Department of Health and Human Services ("HHS") issued a Joint Cybersecurity Advisory in October 2020 warning U.S. healthcare entities of a "credible and imminent cybercrime threat" and urging immediate implementation of robust, layered security defenses.[19]

31. In 2016, the Homeland Security Advisor Council (HSAC) warned that the Financial Services sector faced rapidly growing cyber threats.[20] The chair of the Securities and Exchange Commission (SEC) warned that cybersecurity was the biggest risk to the financial system.[21] The following year, in 2017, the National Infrastructure Advisory Council (NIAC) issued a report titled "Addressing Urgent Cyber Threats to Critical Infrastructure," advising that "[t]oday's cyber attacks are increasingly dangerous and targeted, designed by advanced actors to damage or disrupt

---

[19] Joint Cybersecurity Advisory, *Ransomware Activity Targeting the Healthcare and Public Health Sector* (October 28, 2020), https://www.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf.

[20] HSAC, Final Report of the Cybersecurity Subcommittee: Part I-Incident Response, 2016. https://www.dhs.gov/sites/default/files/publications/HSAC_Cybersecurity_IR_FINAL_Report.pdf

[21] Lisa Lambert and Suzanne Barlyn, SEC says cyber security biggest risk to financial system, REUTERS (May 18, 2016), available at https://www.reuters.com/article/us-finance-summit-sec-idUSKCN0Y82K4/.

critical U.S. infrastructure that deliver vital services—particularly…financial services."[22] According to a 2019 Identity Theft Resource Center and CyberScout Annual End-of-Year Data Breach Report, of the 1,473 recorded data breaches, 108 of them were in the financial services sector, responsible for 62% of the 164 million sensitive records exposed in 2019.[23]

32. Data breaches and identity theft have surged in recent years, creating growing economic consequences for individuals, businesses, and government entities. In 2023 alone, there were 6,077 recorded breaches exposing more than 17 billion records—representing a 19.8% year-over-year increase in the United States compared to 2022.[24] This trend is mirrored in identity theft complaints, which nearly doubled over a four-year span—from 2.9 million reports in 2017 to 5.7 million in 2021.[25]

33. In March 2022, Bloomberg described the financial services industry as experiencing an "unrelenting year of fighting off cyber threats," and warned financial services providers "should expect more of the same or even worse."[26] As noted in the article, the Financial

[22] Securing Cyber Assets: Addressing Urgent Cyber Threats to Critical Infrastructure, THE PRESIDENT'S NATIONAL INFRASTRUCTURE ADVISORY COUNCIL (Aug. 2017), available at https://www.cisa.gov/sites/default/files/publications/niac-securing-cyber-assetsfinal-report-508.pdf.

[23] 2019 End-of-Year Data Breach Report, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/wpcontent/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-BreachReport_FINAL_Highres-Appendix.pdf; 62% of breached data came from financial services in 2019, CIO DIVE (Dec. 23, 2019), available at https://www.ciodive.com/news/62-of-breached-data-came-from-financial-servicesin-2019/569592/; Bitglass' 2019 Financial Breach Report, BITGLASS.

[24] Flashpoint, *2024 Global Threat Intelligence Report*, (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

[25] Insurance Information Institute, *Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20.

[26] Financial Firms Brace for More Cyber Threats After Trying 2021, BLOOMBERG (March 10, 2022), https://www.bloomberg.com/news/articles/2022-03-10/financial-firms-poised-for-worse-cyber-threats-after-trying-year

Services Information Sharing and Analysis Center's ("FS-ISAC") annual report on cyber threats predicted "current trends to continue and possible worsen over the next year," stating cybersecurity is "no longer just a back-office cost." These increases are "due to several factors," including the "rapid digitization of financial services, which accelerated during the pandemic," and "increased entry points for cyber criminals to possibly exploit." Teresa Walsh, who leads FS-ISAC's global intelligence office, described the financial sector as experiencing "a dizzying number of vulnerabilities."

34. In a ruling that took effect in May 2022, the Federal Deposit Insurance Corp. (FDIC), the Office of the Comptroller of the Currency (OCC), and the Federal Reserve (together, the "agencies") now require banks to notify their primary federal regulator within 36 hours of determining whether a "significant computer-security incident" could disrupt business or the stability of the financial sector, and requires banks to inform affected bank customers "as soon as possible," recognizing cyberattacks targeting the financial services industry "have increased in frequency and severity in recent years."[27]

35. Recent statistics confirm that data breaches concerning medical records and/or healthcare have been on a steady upward trend for over a decade. According to the *HIPAA Journal*, these incidents have increasingly involved millions of affected patients.[28] High-profile breaches at healthcare providers and related service companies in recent years include: Change Healthcare,

---

[27] Fed, FDIC, OCC approve 36-hour window for reporting cyberattacks, BANKING DIVE (Nov. 19, 2021), available at https://www.bankingdive.com/news/36-hour-window-fed-fdic-occ-cybersecuritytechnology-vendor/592275/; FEDERAL RESERVE, Computer-Security Incident Notification Requirements for Banking Organizations and Their Bank Service Providers (April 1, 2022), available at https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20211118a1.pdf.

[28] The HIPAA Journal, *Healthcare Data Breach Statistics* (October 26, 2025), https://www.hipaajournal.com/healthcare-data-breach-statistics/.

Inc. (affecting 190 million individuals in 2024); Anthem, Inc. (affecting 78.8 million individuals in 2015); American Medical Collection Agency (affecting more than twenty-six million individuals in 2019); Welltok, Inc. (affecting 14.7 million individuals in 2023); Premera Blue Cross (affecting eleven million individuals in 2015); CareSource (affecting more than three million individuals in 2023); Perry Johnson & Associates, Inc. (affecting 9.3 million people in 2023); Excellus Health Plan, Inc. (affecting ten million individuals in 2015); and many more.[29]

36. Consequently, Conduent should have known of the importance of safeguarding the Private Information and of the foreseeable consequences that would occur if its data security system was breached, including the significant costs that would be imposed on customers as a result of a breach.

37. In fact, Conduent was aware of the risks it faced and even developed white papers and advertising materials based on those risks. In 2022 Conduent published a "2022 Post Incident Privacy Review: The key to successful cyber incident response" white paper. In the blog advertising this white paper, Conduent acknowledges "Organizations are dealing with more cyberattacks than ever, with 50% more attacks on corporate networks in 2021 than in 2020."[30]

38. Conduent repeatedly uses the risky cybersecurity landscape as a marketing tool. In a blog titled "What is incident response in cybersecurity" Conduent acknowledges the risks it and companies face. "'2TB of user data was breached in the latest cyber-attack.' That's unfortunately a real headline that is all too common. … Entire industries, jobs and lives can be impacted for an indeterminate amount of time and require a swift response. It's a hard truth: With new technologies comes new risks of a data breach. But there are ways to proactively protect your organization, end

[29] *Id.*

[30] https://www.conduent.com/insights/2022-post-incident-privacy-review/

users and yourself. Incident response (IR) is the systematic approach taken to manage and mitigate the effects of a cyber incident. Understanding incident response is crucial for organizations of all sizes."[31]

39. In the same article Conduent recognizes the psychological terror victims of identity theft and cyber crime experience: "If you've ever experienced a data breach or had your identity stolen, you understand the sheer sense of panic that sets in as you watch sensitive information altered or even currency stolen right out of your bank accounts. It's a helpless feeling…"[32]

40. Conduent lays out the five key phases of incident response: 1) Preparation "Organizations must ensure they have the right tools and technologies in place to detect and respond to incidents effectively"; 2) Identification "organizations must quickly detect and ascertain the nature of the incident. This involves monitoring security alerts, analyzing logs and investigating potential threats to confirm that an incident has occurred"; 3) Containment "Once an incident is identified, immediate action must be taken to contain the threat"; 4) Eradication "it is essential to ensure that the threat is fully eradicated before moving on to the next phase."; 5) Recovery "organizations work to restore systems and services to normal operation while monitoring for any signs of weaknesses or further incidents"; although styled as a five phase plan, Conduent includes a sixth Lessons Learned: "organizations should conduct a thorough review of the response process. This phase is focused on analyzing what worked, what didn't and how to improve future incident response efforts."[33]

41. According to Conduent, "a strong incident response framework is non-negotiable

[31] https://insights.conduent.com/conduent-blog/what-is-incident-response-in-cybersecurity
[32] https://insights.conduent.com/conduent-blog/what-is-incident-response-in-cybersecurity
[33] https://insights.conduent.com/conduent-blog/what-is-incident-response-in-cybersecurity

for organizations looking to protect their assets and reputation."[34] Despite this representation, Conduent did not have a strong incident response framework.

42. Conduent repeatedly acknowledges and bases its advertisements on the increasing frequency of data breaches: "Look to providers whose core competencies include shoring up their infrastructure to keep customers information secure."[35]

43. In Conduent's March 2025 10-Q they say: "We have in the past been, and remain, susceptible to breach of security systems which may result and has resulted in unauthorized access to our facilities and those of our customers and/or access to and exfiltration of the information we and our customers are trying to protect."

44. But despite all of the publicly available knowledge of the continued risks to client Private Information, and despite holding Private Information of millions of its client's customers, Conduent failed to use reasonable care in maintaining the privacy and security of the Private Information of Plaintiff and Class Members.

45. Had Conduent implemented industry standard security measures and adequately invested in data security, unauthorized parties likely would not have been able to access Conduent's systems and the Data Breach would have been prevented or much smaller in scope.

**D. Defendants are Subject to and Failed to Comply with HIPAA.**

46. HIPAA establishes security provisions and data privacy responsibilities designed to keep individuals' medical information safe. HIPAA compliance provisions, commonly known

---

[34] https://insights.conduent.com/conduent-blog/what-is-incident-response-in-cybersecurity
[35] https://insights.conduent.com/conduent-blog/considerations-for-mitigating-risk-when-outsourcing-critical-communications?_gl=1*lvf4uq*_up*MQ..*_ga*NzI0Mjk1MDYyLjE3NjE3ODk5NTU.*_ga_21KBGVSV08*czE3NjE3ODk5NTQkbzEkZzEkdDE3NjE3ODk5NTQkajYwJGwwJGgw

as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[36]

47. HIPAA requires the implementation of comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI.[37]

48. HIPAA applies to two types of entities: "covered entities," such as healthcare providers, health plans, or healthcare clearinghouses; and "business associates," who are contracted by covered entities to assist in performing healthcare-related functions. *See* 45 C.F.R. § 160.103.

49. Upon information and belief, Conduent is a "business associate" subject to HIPAA because it receives, maintains, and electronically transmits PHI from health plans and pharmaceutical companies. Conduent represents that it serves 9 of the top 10 U.S. health insurers, 6 of the top 10 pharma companies, and that it processes 800 million claims annually.[38]

50. These health insurers, including Blue Shield qualify as "covered entities" under HIPAA because they operate as health plans.

51. HIPAA requires Defendants to implement adequate safeguards to prevent the

---

[36] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[37] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

[38] https://www.conduent.com/healthcare-business-solutions/?_gl=1*3k7mjo*_up*MQ..*_ga*MTEzNzQxMzcyOC4xNzYxNzY4MDg0*_ga_21KBGVSV08*czE3NjE3OTE1ODckbzIkZzAkdDE3NjE3OTE1ODckajYwJGwwJGgw

unauthorized use or disclosure of PHI, including compliance with the HIPAA Security Rule.[39] It is also obligated to report any unauthorized access or disclosure of PHI, including incidents involving breaches of unsecured PHI—such as the Data Breach at issue in this case.[40]

52. These requirements include: (a) ensuring the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identifying and protecting against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protecting against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensuring compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq.*; *see also* 45 C.F.R. § 164.308 (administrative safeguards).

53. The Department of Health and Human Services Office for Civil Rights recommends the following data security measures that covered entities and business associates like Defendants should implement to protect against common cyber-attack techniques:

(1) Regulated entities should implement security awareness and training for all workforce members and that the training programs should be ongoing, and evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

(2) Regulated entities should implement technologies that examine and verify that received emails do not originate from known malicious sites, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

(3) Regulated entities should mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices, or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

---

[39] The HIPAA Security Rule establishes national standards to protect individuals' electronic personal health information that is created, received, used, or maintained by a covered entity. The Security Rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information. *See* 45 C.F.R. Part 160 and Part 164, Subparts A and C.

[40] *See* Breach Notification Rule, 45 C.F.R. §§ 164.400–414.

(4) Regulated entities should implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

(5) Regulated entities should implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[41]

54. Due to the nature of their businesses, Defendants cannot conduct regular operations without collecting and maintaining individuals' PHI—information it knows to be highly sensitive and confidential.

55. Despite their duty to safeguard Plaintiff's and Class Members' PHI and other Private Information, Defendants failed to employ adequate data security measures, including some or all of the measures set forth above. As a result, highly sensitive and confidential information was exposed in the Data Breach.

**E. Defendants Failed to Comply with FTC Guidelines.**

56. Defendants are prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

57. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need

[41] *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S. Dep't Health & Human Services, (Mar. 17, 2022), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html.

for data security should be factored into all business decision-making.[42]

58. In 2016, the FTC updated its publication titled Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.[43] The guidelines recommend that businesses implement the following:

(1) Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

(2) Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

(3) Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

(4) Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

(5) Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[44]

59. In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[45]

---

[42] *See* Federal Trade Commission, *Start with Security: A Guide for Business*, https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

[43] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[44] *Id.*

[45] *See Start with Security: A Guide for Business*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

60. Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

61. Upon information and belief, Defendants failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendants' failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' Private Information constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

62. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[46]

63. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[47] Upon information and belief, Defendants failed to adhere to the NIST guidance.

---

[46] National Institute of Standards and Technology*, Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

[47] *Id.* at Table 2, 26-43.

64. Defendants were well aware of their obligations to use reasonable measures to protect individuals' Private Information. Defendants also knew they were a target for hackers, as discussed above. Despite understanding the risks and consequences of maintaining inadequate data security, Defendants nevertheless failed to comply with their data security obligations, leading to the compromise of Plaintiff's and Class Members' Private Information.

**F. Defendants Knew the Risks of Storing Valuable Private Information.**

65. At all relevant times, Defendants were aware that the Private Information they collected, maintained, created, and exchanged was highly sensitive and of significant value to bad actors seeking to misuse it.

66. Defendants also knew that a breach of their systems—and the resulting exposure of the sensitive information stored therein—posed a serious risk of identity theft, financial fraud, and other harm to affected individuals.

67. Conduent represents on its website that "A data breach costs Fortune 500 companies an average of $347M in legal fees, penalties, remediation and more."[48] And Conduent uses this point to market its services: "Business-critical communications require airtight data security. … Properly vetting a potential provider is crucial since cybersecurity attacks are on the rise and can prevent third parties in the transactional space from getting critical communications out in a timely, compliant manner."[49]

68. Conduent's clients and victims came to Conduent because it advertised itself as secure.

---

[48] https://www.conduent.com/outsourcing-transformation/

[49]https://insights.conduent.com/conduent-blog/considerations-for-mitigating-risk-when-outsourcing-critical-communications?_gl=1*lvf4uq*_up*MQ..*_ga*NzI0Mjk1MDYyLjE3NjE3ODk5NTU.*_ga_21KBGVSV08*czE3NjE3ODk5NTQkbzEkZzEkdDE3NjE3ODk5NTQkajYwJGwwJGgw

69. Private Information has considerable monetary value and is a well-known target for cybercriminals. Hackers can easily sell stolen data, as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[50]

70. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, credit and bank fraud, medical fraud, and more.

71. **Social Security numbers**: Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

72. The Social Security Administration warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use

---

[50] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

> the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[51]

73. Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes Social Security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

74. **Health Insurance Information**: "Stolen personal health insurance information can be used by criminals to obtain expensive medical services, devices and prescription medications, as well as to fraudulently acquire government benefits like Medicare or Medicaid."[52]

75. In fact, there are even guides, tutorials, and documentation available on the dark web to assist novice cybercriminals in conducting health insurance fraud.[53]

76. This type of fraud, known as medical identity theft, can be hard to spot and even harder to recover from—"[t]he average person may have no idea a problem like this can arise until

[51] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[52] Forbes, *Why Cyber-Criminals Are Attacking Healthcare—And How To Stop Them*, Forbes (Oct. 5, 2018), https://www.forbes.com/sites/kateoflahertyuk/2018/10/05/why-cyber-criminals-are-attacking-healthcare-and-how-to-stop-them/?sh=54e8ed1e7f69.

[53] Dark Owl, *Unveiling Insurance Fraud on the Dark Web* (Apr. 25, 2024), https://www.darkowl.com/blog-content/unveiling-insurance-fraud-on-the-dark-web/.

long after a theft occurs."[54]

77. As Eva Velasquez, president and CEO of the Identity Theft Resource Center, explains, a "majority of victims find out when they're trying to move on with their lives, if bills have gone to collections."[55] Additionally, as cybersecurity experts at the American Hospital Association have noted:

> [T]he personal information in people's medical records may be sold in bulk to criminals who create phony providers to submit fraudulent claims on a mass scale that can result in hundreds of millions of dollars in Medicaid, Medicare, or other insurance fraud. Or they may use the information to create fake identities to apply for loans, mortgages, or credit cards.[56]

78. Medical identity theft causes tens of billions of dollars in losses annually.[57]

79. According to a *Reuters* investigation based on interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data sold on underground markets "includes names, birth dates, policy numbers, diagnosis codes and billing information."[58] Fraudsters commonly use this data "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[59]

80. Tom Kellermann, chief cybersecurity officer at cybersecurity firm Carbon Black,

---

[54] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself.

[55] *Id.*

[56] *Id.*

[57] FBI, *Health Care Fraud*, https://www.fbi.gov/investigate/white-collar-crime/health-care-fraud.

[58] Reuters, *Your Medical Record is Worth More to Hackers Than Your Credit Card* (Sept. 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924.

[59] *Id.*

explains: "Health information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an individual."[60]

81. As noted by Paul Nadrag, a software developer at medical device integration firm Capsule Technologies, the high value of medical data stems from its permanence and range of sensitive details:

> The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans.[61]

82. Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[62] In some cases, victims may not even be able to access medical records using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[63]

---

[60] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[61] Fierce Healthcare, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web.

[62] Ponemon Institute, *Fifth Annual Study on Medical Identity Theft* (Feb. 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65.

[63] *Id*.

83. Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements. For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;
- Get contacted by a debt collector about medical debt they do not owe;
- See medical collection notices on their credit report that they do not recognize;
- Find erroneous listings of office visits or treatments on their explanation of benefits (EOB);
- Receive information from their health plan that they have reached their limit on benefits; or
- Be denied insurance because their medical records show a condition they do not have.[64]

84. Perhaps the most dangerous consequence of medical identity theft is the risk of misdiagnosis or improper treatment. Ann Patterson, a senior vice president of the Medical Identity Fraud Alliance, notes: "About 20 percent of victims have told us that they got the wrong diagnosis or treatment, or that their care was delayed because there was confusion about what was true in their records due to the identity theft."[65]

85. A Consumer Reports article titled "The Rise of Medical Identity Theft" describes real-world consequences of this threat, noting that it "isn't a hypothetical problem," and warning that "long tail on medical identity theft can create havoc in victims' lives."[66] As one example, a pregnant woman reportedly used a victim's medical identity to pay for maternity care at a nearby

---

[64] Federal Trade Commission, *Medical Identity theft FAQs for Health Care Providers and Health Plans*, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf.

[65] Consumer Reports, *The Rise of Medical Identity Theft* (Aug. 25, 2016) https://www.consumerreports.org/health/medical-identity-theft-a1699327549/.

[66] *Id.*

hospital. When the infant was born with drugs in her system, the state threatened to take the *victim's* four children away—not realizing her identity had been stolen. The victim ultimately had to submit to a DNA test to remove her name from the infant's birth certificate, but it took years to get her medical records corrected.[67]

86. Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[68] Tom Kellermann notes: "Traditional criminals understand the power of coercion and extortion. By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[69] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

**G. Plaintiff and Class Members Suffered Damages.**

87. For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiff and Class Members significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their bills, records, medical statements, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4)

---

[67] *Id*.

[68] Andrew Steger, *What Happens to Stolen Healthcare Data?* (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[69] *Id*.

search for suitable identity theft protection and credit monitoring services, and pay to procure them.

88. Once Private Information is exposed, there is virtually no way to recover the data or prevent future misuse. This is especially true here, where the information stolen during the Data Breach has been leaked on the dark web and remains available to download. As a result, Plaintiff and Class Members must maintain heightened vigilance indefinitely. Further, Plaintiff and Class Members have not been compensated for the unconsented and unauthorized disclosure of their Private Information, for which there is a robust market.

89. As a direct result of the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer economic and other concrete harms, including but not limited to:

(1) Unauthorized disclosure of their confidential information;

(2) Loss of the control of their Private Information;

(3) Loss of the benefit of their bargain in choosing organizations promising data protection;

(4) Identity theft, fraud, and misuse of medical and financial information;

(5) Out-of-pocket expenses for credit monitoring, mitigation efforts, and fraud prevention tools;

(6) Unauthorized charges and restricted access to financial accounts;

(7) Emotional distress, anxiety, and loss of privacy;

(8) Time and productivity lost dealing with the consequences of the breach;

(9) Damage to credit scores, including from fraudulent inquiries; and

(10) Continued and imminent risk of future fraud and identity theft due to their data being in the hands of unauthorized third parties.

90. Individuals suffer harm each time their personal data is compromised and circulated on underground markets—even if they have been affected by prior breaches. The dark web

contains vast, fragmented repositories of stolen information that can be aggregated by different criminals for varied forms of fraud. Each subsequent breach increases the likelihood that a victim's sensitive data will be accessed by more actors and exploited in new and damaging ways.

91. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes.

92. Plaintiff and Class Members place significant value on data security and consider a company's ability to protect personal information a key factor in their purchasing decisions. Many consumers are willing to pay more for services from organizations that demonstrate strong cybersecurity practices. Conversely, consumers are far less likely to share personal data with companies that have suffered a data breach—reflecting the reputational damage and business consequences that flow from failing to safeguard sensitive information. A fact Conduent capitalizes on in their advertising.[70]

93. Because of the premium consumers place on data privacy, companies including companies in the healthcare sector with robust security practices are viewed more favorably and can command higher prices than those that do not. Had Conduent's clients and clients' customers including Plaintiff known the truth about its lack of cybersecurity—or that it entrusted their sensitive data to an entity with inadequate security practices—they would not have enrolled in Conduent's clients' plans and services; paid less; complained to their brokers, employers or plan

[70] https://insights.conduent.com/conduent-blog/security-minded-cx-business-solutions-provider ("Providers must protect customer data, and, in the event of a leak, quickly prevent any monetary loss. Before inking a deal, check the prevention technologies they use.")

sponsors; or otherwise sought alternative arrangements for services. As a result, Plaintiff and Class Members were deprived of the benefit of their bargain, having paid for secure and responsible handling of their Private Information but receiving substantially less in return.

94. By collecting and storing Plaintiff's and Class Members' sensitive information, Defendants undertook a duty to safeguard it and avoid increasing the risk of identity theft or fraud. Because Defendants failed to uphold that duty, Plaintiff seeks the present value of identity protection services and other compensatory measures to address the current and future harm stemming from the Data Breach.

95. Additionally, Plaintiff and Class Members are entitled to recover the reasonable use value of their Private Information that was accessed and exfiltrated without authorization. This form of compensation mirrors damages awarded in intellectual property cases for unauthorized use of intangible assets. As with a patent or trade secret, Private Information is non-rivalrous: their unauthorized use by a third party does not eliminate the owner's ability to use them but still justifies compensation based on market value.

96. Conduent's delayed and incomplete notice of the Data Breach caused additional harm to Plaintiff and Class Members. The communication failed to disclose critical information, including the scope of the breach, the nature of the information stolen, the number of individuals affected, and the identity of the threat actors. Instead, Conduent issued vague and unsupported reassurances, claiming it was "unaware of any attempted or actual misuse of any information involved in this incident"—despite the fact that the stolen data was obtained by a well-known ransomware gang and Conduent was advertised on the ransomware gang's website. Many victims have likely still not received formal notice. This lack of transparency has deprived victims of the ability to take timely, informed, and proactive measures to mitigate harm caused by the Data

Breach.

97. Conduent recognizes the importance of post-incident response and even offers post-incident privacy review as a service. "At Conduent, we recognize that a thorough post-incident review is vital. Our Post-Incident Response (PIR) solution leverages cutting-edge technology, automation and our professional experts to help response teams understand exposure and quickly notify at-risk parties. This approach efficiently manages data breaches through data mining and data capture. Our advanced technology quickly locates Personally Identifiable Information (PII) and Protected Health Information (PHI) in exposed documents, ensuring accurate identification and regulatory compliance."[71]

98. Conduent offers a "CyberMine Post Incident Analysis" product. These services "enable timely and complaint communication with affected individuals to mitigate risks and ensure a structured, effective outcome. … leverages cutting-edge technology, automation and our professional experts to help response teams understand exposure and quickly notify at-risk parties. … Our advanced technology quickly locates Personally Identifiable Information (PII) and Protected Health Information (PHI) in exposed documents, ensuring accurate identification and regulatory compliance."[72]

99. Despite offering these services and making these representations, Conduent did not quickly notify at-risk parties.

100. Conduent recognizes the importance of cybersecurity to its clients and victims. "It's easy to understand how detrimental such a breach could be to an individual and their ability to

[71] https://insights.conduent.com/conduent-blog/what-is-incident-response-in-cybersecurity
[72] https://www.conduent.com/legal-compliance-analytics/data-risk-analytics-solutions/post-incident-response/

access critical information. Look to providers whose core competencies include shoring up their infrastructure to keep customers information secure."[73] Conduent did not take its own advice.

101. Upon information and belief, Defendants continue to retain the Private Information of Plaintiff and all Class Members. As long as Defendants maintain possession of this information, Plaintiff and Class Members have a strong and ongoing interest in ensuring that adequate safeguards are in place to prevent further unauthorized access or disclosure.

**H. Plaintiff Jerry Sayabath's Experience.**

102. Plaintiff Sayabath is a member of Blue Shield. In order to receive health insurance services, Plaintiff Sayabath was required to provide and entrust Blue Shield with his Private Information. In turn, Blue Shield provided and entrusted Plaintiff Sayabath's Private Information to Conduent for services. When directly and/or indirectly providing and entrusting Defendants with his Private Information, Plaintiff Sayabath reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

103. On or about November 4, 2025, Plaintiff Sayabath received a notification letter from Conduent stating that his Private Information entrusted to Defendants had been compromised in the Data Breach.

104. The letter acknowledged the risk posed to Plaintiff Sayabath and his Private Information compromised as a result of the Data Breach, recommending that Plaintiff Sayabath "Please review the enclosed 'Steps You Can Take to Help Protect Your Information' which describes the services we are offering, how to activate them, and provides further details on how

---

[73] https://insights.conduent.com/conduent-blog/considerations-for-mitigating-risk-when-outsourcing-critical-communications?_gl=1*lvf4uq*_up*MQ..*_ga*NzI0Mjk1MDYyLjE3NjE3ODk5NTU.*_ga_21KBGVSV08*czE3NjE3ODk5NTQkbzEkZzEkdDE3NjE3ODk5NTQkajYwJGwwJGgw

to protect yourself. We encourage you to remain vigilant against the potential for identity theft and fraud and to monitor your credit reports for any suspicious activity."

105. Since learning about the Data Breach, Plaintiff Sayabath has taken precautions to mitigate the risk of future identity theft and fraud. These precautions include monitoring his credit reports and medical records for any signs of medical identity theft. Plaintiff Sayabath will need to continue much of this vigilance indefinitely to protect himself from harm resulting from the Data Breach. But for the Data Breach, Plaintiff Sayabath would not have had to engage in these time-intensive mitigation efforts.

106. Plaintiff Sayabath values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

107. Given the nature of the information involved and the malicious and intentional means through which the information was stolen, the Data Breach has also caused Plaintiff Sayabath to suffer imminent harm arising from a substantially increased risk of additional fraud, identity theft, financial crimes, and misuse of his Private Information. This highly sensitive information is now in the hands of criminals and has likely been leaked on the dark web as a direct and proximate result of Defendants' misconduct.

108. The substantial risk of imminent harm and loss of privacy have also caused Plaintiff Sayabath to suffer stress, fear, emotional distress, and anxiety.

109. Plaintiff Sayabath has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendants' possession, is protected, and safeguarded from future breaches.

## **CLASS ACTION ALLEGATIONS**

110. Pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), as applicable, and/or (c)(4),

Plaintiff seeks certification of the following nationwide class against Conduent:

> Nationwide Class: All U.S. persons whose Private Information was compromised in the Data Breach.

111. Specifically excluded from the Class are Defendants and their officers, directors, or employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir, or assign of Defendants. Also excluded from the Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

112. These proposed class definitions are based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when they move for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

113. **Ascertainablity.** The members of the Class are readily identifiable and ascertainable because the Class are defined based on objective criteria. Defendants and/or its affiliates, among others, possess the information to identify and contact Class Members.

114. **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that joinder of all of them is impracticable. Based on Conduent's statements, the Class contain millions of individuals whose Private Information was compromised in the Data Breach.

115. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** As to the Class, Plaintiff's claims are typical of the claims of the members because all Class Members had their Private Information compromised in the Data Breach and were harmed as a result.

116. **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no known interest

antagonistic to those of the Class and his interests are aligned with Class Members' interests. Plaintiff was subject to the same Data Breach as Class Members, suffered similar harms, and face similar threats due to the Data Breach. Plaintiff has also retained competent counsel with significant experience litigating complex class actions, including Data Breach cases.

117. **Commonality and Predominance: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** There are questions of law and fact common to the Class such that there is a well-defined community of interest in this litigation. These common questions predominate over any questions affecting only individual Class Members. The common questions of law and fact include, without limitation:

(1) Whether Defendants owed Plaintiff and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their Private Information;

(2) Whether Defendants acted negligently in connection with the collection, storage, monitoring and/or protection of Plaintiff's and Class Members' Private Information;

(3) Whether Defendants breached their duties to implement reasonable security procedures to protect Plaintiff's and Class Members' Private Information;

(4) Whether Defendants' breaches of their duties to implement reasonable security procedures directly and/or proximately caused damages to Plaintiff and Class Members;

(5) Whether Defendants provided timely notice of the Data Breach to Plaintiff and Class Members; and

(6) Whether Plaintiff and Class Members are entitled to compensatory damages, statutory damages, punitive damages, and/or nominal damages as a result of the Data Breach.

118. Defendants have engaged in a common course of conduct and Plaintiff and Class Members have been similarly impacted by Defendants' failure act reasonably in collecting and storing the Private Information and to maintain reasonable security procedures and practices to protect such information, as well as Defendants' failure to timely alert affected individuals to the

Data Breach.

119. **Superiority: Federal Rule of Civil Procedure 23(b)(3).** This class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all Class Members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members and risk inconsistent treatment of claims arising from the same set of facts and occurrences. Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under the applicable rules.

120. **Injunctive Relief is Appropriate under Federal Rule of Civil Procedure 23(b)(2).** Defendants have failed to take actions to safeguard Plaintiff's and Class Members Private Information such that injunctive relief is appropriate and necessary. Defendants have acted on grounds that apply generally to the Class (and Subclass) as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## CAUSES OF ACTION

## COUNT I

**Negligence**
***(On Behalf of Plaintiff and the Class)***

121. Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 120 above as though fully set forth herein.

122. Defendants obtained Plaintiff's and Class Members' Private Information for commercial gain. Defendant Conduent collected and stored this Private Information for purposes of providing services to its customers and their clients.

123. Defendants owed Plaintiff and Class Members a duty to exercise reasonable care in protecting their Private Information from unauthorized disclosure or access.

124. Defendants owed a duty of care to Plaintiff and Class Members to provide adequate data security, consistent with industry standards, to ensure that their systems and networks adequately protected the Private Information.

125. Defendants' duty to use reasonable care in protecting Private Information arises as a result of their relationship as a healthcare and financial services company, common law and federal law, and their own statements regarding privacy and data security. Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices.

126. Given the sensitivity of the Plaintiff's and Class Members' Private Information that Defendants collected and stored, and given the history of data breaches against other entities in the healthcare and financial services sectors as described above, it was foreseeable that cybercriminals would attempt to hack Defendants' systems to obtain Plaintiff's and Class Members' Private Information.

127. Defendants' duties included obligations to take reasonable steps in the management of the Private Information of Plaintiff and Class Members to prevent its disclosure and safeguard such information from theft. Defendants' duties included the responsibility to affirmatively design, implement, and monitor data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach.

128. Defendants were aware of and embraced their duty to exercise reasonable care in handling the Private Information of Plaintiff and Class Members.

129. For example, on its websites, Conduent touts that "We respect and are committed to safeguarding the confidentiality, data privacy, and security of the information that our customers

have entrusted to us, including the confidential information, personally identifiable information, proprietary information, and trade secrets gathered across all of our business operations."[74]

130. Blue Shield on its website represents that: "Keeping your health data and personal information safe is our goal. … Protecting your private health information is our responsibility."[75]

131. Defendants were subject to an independent legal duty to exercise reasonable care in handling Plaintiff's and Class Members' Private Information, untethered to any contract between it and either Plaintiff or Class Members. In addition to the duties described above, the sources of Defendants' duties are those imposed by laws such as Section 5 of FTC Act and HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations..

132. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. 15 U.S.C. § 45(a)(1).

133. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

134. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and failing to comply with applicable industry standards, including but not limited to failing to protect against foreseeable security threats such as ransomware attacks. Defendants' conduct was unreasonable given the nature and amount of Private Information it obtained, stored, and disseminated in the regular course of their business, and the foreseeable

[74] https://www.conduent.com/privacypolicy/?_gl=1*zn3u19*_up*MQ..*_ga*MTEzNzQxMzcyOC4xNzYxNzY4MDg0*_ga_21KBGVSV08*czE3NjE3NjgwODMkbzEkZzEkdDE3NjE3NjgxNzkkajYwJGwwJGgw
[75] https://www.bcbsil.com/about-us/cybersecurity

consequences of a data breach, including, specifically, the significant damage that would result to Plaintiff and Class Members.

135. Defendants are entities covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

136. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations, Defendants had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

137. Specifically, HIPAA requires Defendants to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it created, received, maintained, or transmitted; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforces to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

138. HIPAA also requires Defendants to provide Plaintiff and the Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400-414.

139. Defendants violated HIPAA by actively disclosing Plaintiff's and Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; by failing to protect against foreseeable security threats such as ransomware attacks; and by failing to provide Plaintiff and Class Members with adequate notification of the Data Breach within 60 days after its discovery.

140. Defendants knew, or should have known, of the risks inherent in collecting and storing Private Information in a centralized location, their vulnerability to ransomware and network

attacks, and the importance of adequate security.

141. Defendants breached their duties to Plaintiff and Class Members in numerous ways, as described herein, including by:

a. Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the Private Information of Plaintiff and Class Members;

b. Failing to comply with industry standard data security measures leading up to the Data Breach;

c. Failing to protect against foreseeable security threats such as ransomware attacks;

d. Failing to comply with their own privacy policies and those of the entities for which it provided services;

e. Failing to comply with regulations protecting the Private Information at issue during the period of the Data Breach;

f. Failing to adequately monitor, evaluate, and ensure the security of their network and systems;

g. Failing to recognize in a timely manner that Private Information had been compromised; and

h. Failing to timely and adequately disclose the Data Breach.

142. Plaintiff's and Class Members' Private Information would not have been compromised but for Defendants' wrongful and negligent breach of their duties.

143. Defendants' failure to take proper security measures to protect the sensitive Private Information of Plaintiff and Class Members created conditions conducive to a foreseeable,

intentional criminal act, namely the unauthorized access and exfiltration of Private Information by unauthorized third parties. Given that entities in the healthcare and financial services industry are prime targets for hackers, Plaintiff and Class Members are part of a foreseeable, discernible group that was at high risk of having their Private Information misused or disclosed if not adequately protected by Defendants.

144. It was also foreseeable that Defendants' failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff and Class Members.

145. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have and will suffer monetary and non-economic damages including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by Defendants' data breach; (x) the loss of

the benefit of the bargain for the failure of Defendants to securely store and maintain their Private Information; and (xi) any nominal damages that may be awarded.

146. Plaintiff and Class Members seek all available damages suffered as a result of Defendants' negligence, including compensatory, consequential, general, and/or nominal damages.

**COUNT II**

**Negligence *Per Se***
***(On Behalf of Plaintiff and the Class)***

147. Plaintiff repeats and realleges by every allegation set forth in Paragraphs 1 through 120 above as though fully set forth herein.

148. Section 5 of the FTC Act prohibits "unfair … practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities, such as Conduent, for failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Defendants' duty.

149. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with industry standards, including but not limited to failing to protect against foreseeable security threats such as ransomware attacks. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of a data breach involving health and financial information.

150. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

151. The harm that has occurred as a result of Conduent's conduct is the type of harm that the FTC Act was intended to guard against.

152. Defendants' violation of Section 5 of the FTC Act constitutes negligence *per se*.

153. As a business associate and health plan, Defendants are entities covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

154. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations, Defendants had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class Members' electronic PHI.

155. Specifically, HIPAA required Defendants to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by their workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

156. HIPAA also requires Defendants to provide Plaintiff and the Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400–414.

157. Defendants violated HIPAA by actively disclosing Plaintiff's and Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; by failing to protect against foreseeable security threats such as ransomware attacks; and by failing to provide Plaintiff and Class Members with adequate notification of the Data Breach within 60 days after its discovery.

158. Plaintiff and Class Members are patients within the class of persons HIPAA was intended to protect, as they are insured or have insurance processed by one of Defendants' clients.

159. The harm that has occurred as a result of Defendants' conduct is the type of harm that HIPAA was intended to guard against.

160. Defendants' violation of HIPAA constitutes negligence *per se*.

161. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including those identified above.

162. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have been injured as described herein and are entitled to damages in an amount to be proven at trial.

## COUNT III

**Unjust Enrichment**
***(On Behalf of Plaintiff and the Class)***

163. Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 120 above as though fully set forth herein.

164. Plaintiff and Class Members have an interest, both equitable and legal, in the Private Information about them that was conferred upon, collected by, used by, and maintained by Defendants and that was ultimately stolen in the Data Breach.

165. Plaintiff and Class Members procured healthcare and financial services from Defendants, and thereby conferred a benefit upon them in the form of monies they paid for these services. Plaintiff and Class Members also conferred their Private Information upon Defendants.

166. Defendants benefited by the conferral upon it of the Private Information pertaining to Plaintiff and the Class Members and by their ability to retain, use, and profit from that information. Defendants understood and valued these benefits.

167. Defendants also understood and appreciated that the Private Information pertaining to Plaintiff and Class Members was private and confidential and its value depended upon Defendants maintaining the privacy and confidentiality of that Private Information.

168. Without Defendants' willingness and commitment to maintain the privacy and

confidentiality of the Private Information, that Private Information would not have been transferred to and entrusted to Defendants. Further, if Defendants had disclosed that their data security measures were inadequate, Defendants would not have been permitted to continue in operation by regulators or their clients.

169. Because of Defendants' use of Plaintiff's and Class Members' Private Information, Defendants sold more services and products than they otherwise would have. Defendants were unjustly enriched by profiting from the additional services and products it was able to market, sell, and create to the detriment of Plaintiff and Class Members.

170. Defendants also benefitted through their unjust conduct by retaining money that they should have used to provide reasonable and adequate data security to protect Plaintiff's and Class Members' Private Information, or to exercise sufficient oversight over the data security practices of their contractors.

171. Defendants also benefited through their unjust conduct in the form of the profits they gained through the use of Plaintiff's and Class Members' Private Information.

172. It is inequitable for Defendants to retain these benefits.

173. As a result of Defendants' wrongful conduct as alleged in this Complaint (including among other things their failure to employ and oversee adequate data security measures, their continued maintenance and use of the Private Information belonging to Plaintiff and Class Members without having adequate data security measures, and their other conduct facilitating the theft of that Private Information), Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and Class Members.

174. Defendants' unjust enrichment is traceable to and resulted directly and proximately from the conduct alleged herein, including the compiling and use of Plaintiff's and Class Members'

sensitive Private Information, while at the same time failing to ensure that information maintained was secure from intrusion and theft by hackers and identity thieves.

175. It is inequitable, unfair, and unjust for Defendants to retain these wrongfully obtained benefits. Defendants' retention of wrongfully obtained monies violates fundamental principles of justice, equity, and good conscience.

176. The benefits conferred upon, received, and enjoyed by Defendants were not conferred gratuitously, and it would be inequitable, unfair, and unjust for Defendants to retain the benefit.

177. Defendants' defective security and their unfair and deceptive conduct has, among other things, caused Plaintiff and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their Private Information and has caused Plaintiff and Class Members other damages as described herein.

178. Plaintiff and Class Members have no adequate remedy at law because of Defendants' continuing inadequate security practices, and because their injuries include an imminent and ongoing risk of identity theft and fraud.

179. Defendants are therefore liable to Plaintiff and Class Members for restitution or disgorgement in the amount of the benefit conferred on Defendants as a result of their wrongful conduct, including specifically: the value to Defendants of the Private Information that was stolen in the Data Breach; the profit Defendants received and are receiving from the use of that information; the amounts that Defendants overcharged Plaintiff and Class Members for use of their products and services; and the amounts that Defendants should have spent to provide reasonable and adequate data security to protect Plaintiff's and Class Members' Private Information.

## COUNT IV

## Breach of Implied Contract

**(*On Behalf of Plaintiff and the Class against Blue Shield*)**

180. Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 120 above as though fully set forth herein.

181. Plaintiff and Class Members were required to provide sensitive Private Information to Blue Shield as a precondition for receiving healthcare. As part of this exchange, there was an implied contract with Blue Shield when it accepted custody of their Private Information.

182. As part of these transactions, Blue Shield agreed to safeguard and protect the Private Information of Plaintiff and Class Members and to timely and accurately notify them if it was breached or compromised.

183. Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that Blue Shield's data security practices and policies were reasonable and consistent with the legal requirements, industry standards, and Blue Shield's own representations.

184. Blue Shield's implied promises to safeguard Plaintiff's and Class Members' Private Information are evidenced by representations on Blue Shield's websites. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Blue Shield on the other, is further demonstrated by their conduct and course of dealing. Such representations include:

(1) "Keeping your health data and personal information safe is our goal."

(2) "Your trust is earned through our actions. All technology cybersecurity measures we implement are designed with one goal. We strive to keep your health information safe so you can focus on what matters—your health and wellbeing."

(3) "The information you have on file with Blue Cross and Blue Shield of Illinois includes a lot of private details. That means BCBSIL and other health insurers like us can be the target of hackers. Protecting your private health information is our responsibility. It is core to our mission of doing everything we can to stand by our members."[76]

[76] https://www.bcbsil.com/about-us/cybersecurity

185. Plaintiff and Class Members reasonably believed that Blue Shield would use part of the monies paid to Blue Shield under the implied contracts or the monies obtained from the benefits derived from the Private Information they provided to fund proper and reasonable data security practices.

186. Plaintiff and Class Members would not have provided and entrusted their Private Information to Blue Shield or would have paid less for Blue Shield's products or services in the absence of the implied contract or implied terms between them and Blue Shield. The safeguarding of the Private Information of Plaintiff and Class Members was material to realize the intent of the parties.

187. Plaintiff and Class Members fully performed their obligations under the implied contracts with Blue Shield.

188. Blue Shield breached their implied contracts with Plaintiff and Class Members to protect their Private Information when Blue Shield by: (1) failing to implement adequate data security to protect Plaintiff's and Class Members' Private Information; (2) disclosing that information to unauthorized third parties and; (3) failing to notify Plaintiff and Class Members of the specific data breached in a reasonably timely manner.

189. As a direct and proximate result of Blue Shield's breach of implied contract, Plaintiff and Class Members have been injured and are entitled to damages. Plaintiff and Class Members seek all available damages, including compensatory, consequential, general, and/or nominal damages, in an amount to be proven at trial.

## COUNT V

**Declaratory and Injunctive Relief**
***(On Behalf of Plaintiff and the Class)***

190. Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 120

above as though fully set forth herein.

191. This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, which authorizes this Court to enter a judgment declaring the rights and legal relations of the parties and grant necessary further relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statute and state common law as described in this Amended Complaint.

192. Upon reason and belief, Defendants still possess the Private Information of Plaintiff and the Members of the Class. Further, Defendants still owe legal duties to adequately secure and protect the Private Information of Plaintiff and Members of the Class.

193. There is no reason to believe that Defendants' security measures are any more adequate now than they were before the Data Breach to meet their legal duties. For example, since the Data Breach, Defendants have not yet announced any specific changes to their data security infrastructure, processes or procedures to fix the vulnerabilities in their computer systems and/or security practices which permitted the Data Breach to occur and go undetected and, thereby, prevent further attacks.

194. An actual controversy has arisen in the wake of the Data Breach regarding the Private Information of Plaintiff and Class Members and whether Defendants is currently maintaining data security measures adequate to protect from further data breaches that compromise such Private Information. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and Class Members continue to suffer injury as a result of the compromise of their Private Information as it remains accessible on the and remain at imminent risk that further compromises of their Private Information will occur in the future.

195. Pursuant to its authority under the Declaratory Judgment Act, this Court should

enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure Private Information obtained from Plaintiff and Class Members and to timely notify such individuals of a data breach under the common law, Section 5 of the FTC Act and HIPAA;

b. Defendants breached and continue to breach this legal duty by failing to employ reasonable measures to secure consumers' Private Information; and

c. Defendants' breach of their legal duty continues to cause harm to Plaintiff and Class Members.

196. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols (and oversight of such protocols) consistent with law and industry standards to protect individuals' (i.e., those of Plaintiff and Class Members) Private Information.

197. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendants. The risk of another such breach is real, immediate, and substantial, a fact Conduent acknowledges in its Form 10-Q.[77] In fact, now that Conduent's insufficient data security is known to hackers, the Private Information in Conduent's possession is even more vulnerable to cyberattack. If another breach at Defendants occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

198. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiff will likely be subjected to substantial

[77] https://investor.conduent.com/static-files/51988fc8-eb0e-45fb-b64d-badf2e4817eb at p. 33.

identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a preexisting legal obligation to employ such measures.

199. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendants, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and consumers whose confidential information would be further compromised.

## COUNT VI

**Breach of Third-Party Beneficiary Contract**
***(On Behalf of Plaintiff and the Class)***

200. Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 120 above as though fully set forth herein.

201. As a business associate that provides services to Blue Shield and other health insurance providers, upon information and belief Conduent enters into Business Associate Agreements with Blue Shield and its other clients.

202. A Business Associate Agreement is a contract under HIPAA that is between a covered entity (such as a health insurance company like Blue Shield) and business (such as Conduent) when that business performs certain functions on behalf of or provides a service to, the covered entity that involves the creation maintenance or transmission of PHI.

203. A Business Associate Agreement establishes a business associate's permissible uses of PHI, hot the business associate will comply with HIPAA's Privacy Rule, and the responsibility of both the business associate and covered entity to maintain the privacy and security of PHI.

204. On information and belief, Conduent entered into written contracts with Blue Shield

and others regarding the use of Plaintiff's and Class Members' Private Information for the provision of software services to assist in providing health insurance to Plaintiff and Class Members, including entering into Business Associate Agreements.

205. Conduent agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class and to timely and adequately notify them of the Data Breach.

206. Plaintiff and Class Members are members of a class of people that the parties to the contracts intended to protect and benefit. Thus, Plaintiff and Class Members are third-party beneficiaries of such contracts.

207. Terms of compliance with HIPAA are expressly for the benefit of Plaintiff and the Class Members, as the statute is intended to protect the information of individual patients. Therefore, these contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendants. Conduent knew that, if it were to breach these contracts, Plaintiff and Class Members would be harmed.

208. Conduent breached the contracts they entered into with Blue Shield and others by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately notifying Plaintiff and Class Members of the Data Breach.

209. As a direct and proximate result of Conduent's breaches of contract, Plaintiff and Class Members have been injured and are entitled to damages (including but not limited to special, consequential, and nominal damages) in an amount to be proven at trial.

## COUNT VII

**Breach of Fiduciary Duty**
**(*On Behalf of Plaintiff and the Class against Conduent*)**

210. Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 120 above as though fully set forth herein.

211. Plaintiff and Class Members have an interest, both equitable and legal, in their Private Information that was conveyed to, collected by, and maintained by Defendants and which was ultimately accessed or compromised in the Data Breach.

212. The Private Information of Plaintiff and Class Members was disclosed to Defendants. That Private Information is akin to the health information communicated to their medical providers when receiving medical care.

213. In order to receive services for healthcare, Plaintiff and Class Members had to disclose their Private Information to their insurers (such as Blue Shield), and ultimately (without their knowledge) to Conduent.

214. As the recipient of Plaintiff's and Class Members' Private Information, which was given to it in order to obtain healthcare, Conduent has a fiduciary relationship with Plaintiff and Class Members.

215. Conduent knew that Plaintiff and Class Members had to unknowingly entrust their Private Information with it so that they could receive health insurance benefits, and ultimately, health care. Conduent therefore exercised a controlling influence over Plaintiff and Class Members as it related to the security of their Private Information.

216. Conduent voluntarily undertook this fiduciary duty by knowingly contracting with insurers subject to HIPAA requirements, and as reflected in its representations that, among other things, its operations would be compliant with HIPAA and that it had sufficient safeguards to

ensure data security.

217. Because of that fiduciary relationship, Conduent was provided with and stored Plaintiff's and Class Members' valuable Private Information. Plaintiff and Class Members expected their information to remain confidential while in Conduent's possession.

218. In light of the special relationship between Conduent and Plaintiffs and Class Members, Conduent became a fiduciary by undertaking a guardianship the Private Information to act for Plaintiffs and Class Members for: (a) the safeguarding of the Private Information; (b) the providing of timely notice of a Data Breach regarding that Private Information; and (c) the maintenance of complete and accurate records regarding the storage, usage of, and access to the Private Information.

219. Conduent breached its fiduciary duty to Plaintiff and Class Members by not acting reasonably in collecting, storing, transmitting, and maintaining the Private Information; in failing to encrypt the Private Information; failing to protect the integrity of the systems containing Plaintiff's and Class Members' Private Information; in failing to provide timely and sufficient notice of a Data Breach regarding the Private Information; and by otherwise failing to safeguard Plaintiff's and Class Members' Private Information from unauthorized access and disclosure.

220. Plaintiff and Class Members did not consent to nor authorize Blue Shield (or its contractor Conduent) to release or disclose their Private Information to unauthorized third parties or to cybercriminals.

221. As a direct and proximate result of Conduent's conduct, Plaintiff and Class Members have and will suffer monetary and non-economic damages including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information (including medical information) to unauthorized third parties; (iii) out-of-pocket

expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Blue Shield's possession and is subject to further unauthorized disclosures so long as Conduent fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the loss of the benefit of the bargain for the failure of Conduent to securely store and maintain their Private Information; and (xi) any nominal damages that may be awarded.

222. Plaintiff and Class Members seek all available damages suffered as a result of Conduent's breach of its fiduciary duty, including compensatory, consequential, general, and/or nominal damages.

## COUNT VIII

**Breach of Fiduciary Duty**
**(*On Behalf of Plaintiff and the Class against Blue Shield*)**

223. Plaintiff repeats and realleges every allegation set forth in paragraphs 1 through 120 above as though fully set forth herein.

224. Plaintiff and Class Members have an interest, both equitable and legal, in their Private Information that was conveyed to, collected by, and maintained by Blue Shield and which

was ultimately accessed or compromised in the Data Breach.

225. The Private Information of Plaintiffs and Class Members was disclosed to Blue Shield. That Private Information is akin to the health information communicated to their medical providers when receiving medical care.

226. In order to receive services for healthcare, Plaintiffs and Class Members had to disclose their Private Information to their insurers (such as Blue Shield), and ultimately (without their knowledge) to Conduent.

227. As the recipient of Plaintiff's and Class Members' Private Information, which was given to it in order to obtain healthcare, Blue Shield has a fiduciary relationship with Plaintiffs and Class Members.

228. Blue Shield knew that Plaintiffs and Class Members had no realistic choice but to entrust their Private Information with Blue Shield so that they could receive health insurance benefits, and ultimately, health care. Blue Shield therefore exercised a controlling influence over Plaintiffs and Class Members, and Plaintiffs and Class Members placed their confidence in Blue Shield as it related to the security of their Private Information.

229. Blue Shield voluntarily accepted such confidence as reflected in its representations that, among other things, its operations and privacy practices would be compliant with HIPAA.

230. Blue Shield has recognized its high duties with respect to data security, "keeping your health data and personal information safe is our goal" and acknowledging that "protecting your private health information is our responsibility."[78]

231. Because of that fiduciary relationship, Blue Shield was provided with and stored Plaintiffs' and Class Members' valuable Private Information. Plaintiffs and Class Members

[78] https://www.bcbsil.com/about-us/cybersecurity

expected their information to remain confidential while in Blue Shield's possession.

232. In light of the special relationship between Blue Shield and Plaintiffs and Class Members, Blue Shield became a fiduciary by undertaking a guardianship the Private Information to act for Plaintiffs and Class Members for: (a) the safeguarding of the Private Information, and exercising oversight over Conduent, to which it entrusted the Private Information; (b) the providing of timely notice of a Data Breach regarding that Private Information; and (c) the maintenance of complete and accurate records regarding the storage, usage of, and access to the Private Information.

233. Blue Shield breached its fiduciary duty to Plaintiffs and Class Members by not acting reasonably in collecting, storing, transmitting, and maintaining the Private Information; in failing to ensure encryption of the Private Information; failing to ensure the systems containing Plaintiffs' and Class Members' Private Information were sufficiently protected; in failing to provide timely and sufficient notice of a Data Breach regarding the Private Information; and by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure.

234. Plaintiffs and Class Members did not consent to nor authorize Blue Shield (or its contractor Conduent) to release or disclose their Private Information to unauthorized third parties or to cybercriminals.

235. As a direct and proximate result of Blue Shield's conduct, Plaintiffs and Class Members have and will suffer monetary and non-economic damages including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information (including medical information) to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or

unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Blue Shield's possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by the Data Breach; (x) the loss of the benefit of the bargain for the failure of Blue Shield to securely store and maintain their Private Information; and (xi) any nominal damages that may be awarded.

236. Plaintiff and Class Members seek all available damages suffered as a result of Blue Shield's breach of its fiduciary duty, including compensatory, consequential, general, and/or nominal damages.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully request the following relief:

A. That the Court certify this action as a class action and appoint Plaintiff and his Counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiff and Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

E. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

F. That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a jury trial in the instant action.

Dated: November 13, 2025

*/s/Zachary A. Jacobs*
James E. Cecchi*
Zachary A. Jacobs IL Bar #: 6294345
Grant Y. Lee IL Bar #: 6290026
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
222 S. Riverside Plaza
Chicago, IL 60606
Tel: (973) 994-1700
jcecchi@carellabyrne.com
zjacobs@carellabyrne.com
glee@carellabyrne.com

Norman E. Siegel*
Barrett J. Vahle*
Tanner J. Edwards*
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: (816) 714-7100
siegel@stuevesiegel.com
vahle@stuevesiegel.com
tanner@stuevesiegel.com

**Pro Hac Vice forthcoming*

***Attorneys for Plaintiff Sayabath and the Proposed Class***